# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **910 E MAIN L L C ET AL** | **CASE NO.  6:20-CV-00965** |
| **VERSUS** | **JUDGE SUMMERHAYS** |
| **JOHN BEL EDWARDS ET AL** | **MAGISTRATE JUDGE HANNA** |

## MEMORANDUM RULING

This case is one of several state and federal cases challenging executive orders issued by Louisiana Governor John Bel Edwards (the "Governor") to combat the current COVID-19 health crisis in the State of Louisiana. Here, like a companion case in the United States District Court for the Eastern District of Louisiana,[1] a group of eleven bar owners are challenging the specific provisions in the Governor's executive orders preventing bars from serving customers on-site— specifically Section 2 of Executive Order 89 JBE 2020 and Section 2 of Executive Order 96 JBE 2020.[2] They claim that these provisions, as applied to them, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

The present matter before the Court is the Motion for Temporary Restraining Order, Preliminary Injunction and Expedited Relief [ECF Doc. 4] filed by the plaintiff bar owners (collectively, "Plaintiffs"). This Court previously denied Plaintiffs' request for a temporary restraining order but set Plaintiffs' Motion for an expedited hearing on Plaintiffs' request for a preliminary injunction [ECF No. 12]. The Court held an evidentiary hearing on the Motion on August 17, 2020 and took the Motion under advisement at the close of the hearing. After reviewing

---

[1] *4 Aces Enter., LLC v. Edwards*, ___ F.Supp.3d ___, 2020 WL 4747660 (E.D. La. Aug. 17, 2020).  The *4 Aces* court denied injunctive relief in an opinion released earlier this week. *Id.*
[2] Defendants' Exhibits 29 and 30.

and considering the evidentiary record, the arguments of counsel, and the governing legal authorities, the Court rules as follows.

# I.
## Background

On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic in response to the spread of COVID-19, an infectious disease originating in Wuhan, China in 2019 and present in the United States by early 2020.[3] That same day, Governor Edwards declared a statewide public health emergency under the Louisiana Health Emergency Powers Act, La. R.S. 29:760, *et seq.*, as a result of the imminent, yet then-unknown threat posed to Louisiana citizens by COVID-19.[4] On March 22, 2020, Governor Edwards enacted 33 JBE 2020 (the "Stay at Home Order") directing the people of Louisiana to stay in their homes except for essential trips and travel to and from work. The executive order also ordered that certain businesses be closed, and placed limitations on other businesses that were allowed to remain open.[5] The Governor issued the Stay at Home Order because, at that time, data showed that "Louisiana ha[d] the fastest growth rate of confirmed COVID-19 cases in the world."[6] The Stay at Home Order, in part, mandated closure of pool halls, concert and music halls, adult entertainment venues, and "other similar businesses."[7]

On May 15, 2020, the Governor issued an order moving Louisiana into Phase 1 of reopening (the "Phase 1 Order") reasoning that "since the time of the original Stay at Home order, the number of new COVID-19 cases and COVID-related hospitalizations in Louisiana have decreased, with the peak of hospitalizations occurring on or near April 13, 2020."[8] As part of the

---

[3] *See* WHO Director-General's opening remarks at the media briefing on COVID-19 – 11, March 2020 (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefingon-covid-19---11-march-2020, attached as Exhibit 3 to Document 23.
[4] *See* Proclamation No. 25 JBE 2020, Exhibit 9 to Document 23.
[5] Defendants' Exhibit 8.
[6] Exhibit 11 to Document 23.
[7] Defendants' Exhibit 8.
[8] Proclamation No. 58 JBE 2020, Defendants' Exhibit 9.

Phase 1 Order, which was consistent with the White House Guidelines, the Governor lifted portions of the Stay at Home Order.[9] These actions were consistent with White House guidelines.[10] The criteria for re-opening businesses under the Phase I Order was tied to percentages of total occupancy "as determined by the State Fire Marshal" and "applicable guidance from the State Fire Marshal published at opensafely.la.gov."[11] However, bars without a Louisiana Department of Health ("LDH") food service permit were still considered nonessential businesses under Phase 1 and ordered to remain closed to the public.[12]

On June 5, 2020, Governor Edwards issued an order moving Louisiana into Phase 2 of reopening (the "Phase 2 Order") as Louisiana had met the White House Guidelines criteria for Phase 2.[13] The Governor issued the Phase 2 Order in line with data that showed an improving public health situation in Louisiana, such as COVID-related hospitalizations dropping to 661 after peaking at more than 2,100.[14] Under Sections 2(G)(1)(c) and (d) of the Phase 2 Order, bars were permitted to reopen. Bars with an approved food service permit from LDH were allowed to operate at 50% of capacity, as determined by the State Fire Marshal, along with other social distancing measures. Bars without an approved food service permit from LDH were allowed to reopen at 25% of capacity.[15]

By the beginning of July, the COVID-19 situation in Louisiana had steadily worsened. Louisiana "posted more than 2,000 new cases [a day on July 10 and July 11], and the share of tests coming back positive had risen along with hospitalizations."[16] In the course of three weeks in July,

---

[9] *Id.*
[10] Guidelines for Opening Up America Again, the White House (4-16-2020), Defendants' Exhibit 41.
[11] Defendants' Exhibit 9.
[12] *Id.*
[13] Proclamation No. 74 JBE 2020, Defendants' Exhibit 10.
[14] Exhibit 14 to Document 23.
[15] *Id.*
[16] *See* Billioux Declaration, ¶¶ 18-24.

the number of patients in Ochsner Health System hospitals in Louisiana doubled.[17] Moreover, this increase in COVID-19 cases hit parishes that had largely been spared by the initial phase of the pandemic in March and April, including the Acadiana area.[18] Based on this increase in COVID-19 cases, on July 11, 2020, the Governor issued 89 JBE 2020 ("EO 89-2020"), effective July 13, 2020.[19] This executive order mandated closure of all bars statewide for on-premises consumption, restricted indoor and outdoor "crowd sizes … to no more than 50 people" for other types of gatherings, established mandatory face covering (mask) requirements for the public, and required "all businesses and organizations" to "require all persons who enter the premises to wear a face covering" under threat of criminal sanction against the business owner who "fails to enforce the requirement to wear face coverings."[20] Governor Edwards extended the bar-related restrictions on July 23, 2020 under Executive Order 96 JBE 2020 ("EO 96-2020").[21] On July 26, 2020, the White House issued a "State Report" for Louisiana summarizing updated COVID-19 data and making "recommendations to the states as far as COVID-19 mitigation measures."[22] The White House recommended, *inter alia*, that the state "[m]andate the use of masks in all current and evolving hot spots" and to consider closing "establishments where social distancing and mask use cannot occur, such as bars."[23] However, some political leaders in Louisiana challenged the state law and constitutional basis for these orders.[24]

---

[17] *See* Declaration of Robert Hart.
[18] *See* Defendants' Exhibit 49, Declaration of John Bel Edwards, ¶23
[19] Defendants' Exhibit 29.
[20] *Id.*
[21] Defendants' Exhibit 30.
[22] Exhibit H to Document 1.
[23] *Id.*
[24] *See, e.g.,* Letter from Louisiana Attorney General, Jeff Landry, Exhibit E to Document 1.

The Complaint in the instant case was originally filed by eleven (11) entities operating as bars.[25] On August 6, 2020, six (6) of the original plaintiffs dismissed their claims.[26] On that same day, an Amended Complaint was filed that added six (6) additional plaintiffs.[27] Plaintiffs allege that they all operate as bars and that they have been negatively impacted by the executive orders issued by Governor Edwards.

## II.
### APPLICABLE LAW

A party seeking a temporary restraining order or preliminary injunction under Rule 65 must show: (i) a substantial likelihood of success on the merits; (ii) the movant will suffer irreparable injury without the injunction; (iii) the threatened injury to the movant outweighs the threatened harm to the party whom he seeks to enjoin; and (iv) granting the injunction will not disserve the public interest. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991). The decision to grant an injunction is "an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 809 (5th Cir. 1989).

To prove a likelihood of success on the merits, the moving party must show that it will "likely prove" the merits of its claims.[28] The standard for proving irreparable injury is not a mere possibility, but a likelihood:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is

---

[25] 910 E Main 22, LLC d/b/a Quarter Tavern, Bubba's Saloon, LLC, CJD III LLC d/b/a Twisted Tavern, Doug McCarthy Enterprises Inc. d/b/a "501," Emerald Billiards, LLC, Mulligan's on the Teche, LLC, d/b/a Cantina's Downtown, My Place Bar & Grill, LLC, Napoleons on the Teche, LLC, Pool Do's Sports Bar LLP, SoCo Sports Bar, LLC, and YED Enterprises LLC d/b/a Dewey's Lounge.

[26] Bubba's Saloon LLC, CJD III LLC d/b/a Twisted Tavern, Emerald Billiards, LLC, Mulligan's on the Teche, LLC d/b/a Cantina's Downtown, Napoleons on the Teche, LLC, and YED Enterprises LLC d/b/a Dewey's Lounge.

[27] Big Dan's Bar, Inc., City Bar, Inc., CKBCPB5 LLC d/b/a The Chatter Box, Sandi's Anchor Lounge, LLC d/b/a Da Camp, Tipsy Cajun, LLC, and Wanous LLC d/b/a AJ's 2nd St. Pub.

[28] *Mylan Institutional LLC v. Aurobinado Pharma Ltd*, 857 F.3d 858, 866 (5th Cir. 2017).

inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[29]

The third part of the test requires the Court to balance the harm that would be suffered by Plaintiffs if the injunction were denied against the possible harm that would result to the Defendants if the injunction were granted.[30] The fourth part of the test requires the Court to determine whether granting the injunctive relief will disserve the public interest.[31]

### III.
### EVIDENCE PRESENTED

Plaintiffs presented the testimony of Dr. Alexander Billioux on cross examination; Murphy Painter, former Commissioner of Louisiana Office of Alcohol and Tobacco Control; Jason Romero, owner of Pool Do's Sports Bar LLP; Tanya Abshire, owner of My Place Bar & Grill, LLC; and Ty Boudoin, owner of 910 E Main 33, LLC d/b/a Quarter Tavern. Defendants presented the testimony of Dr. Billioux and Governor John Bel Edwards.

Romero, Abshire, and Boudoin testified as to the mitigation efforts that each of them had taken when bars were allowed to operate during the pandemic. They also testified as to the impact of the Governor's executive orders on their businesses, namely that their businesses are currently closed. Mr. Painter testified regarding the difference between bar and restaurant permits under Louisiana law.

Dr. Billioux is currently employed by the Louisiana Department of Health as its Assistant Secretary of the Office of Public Health.[32] Dr. Billioux testified that he has been directly involved in the state's response to COVID-19 and meets with and advises the Governor on a daily basis

---

[29] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted).
[30] *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 626 (5th Cir. 1985).
[31] *Id*. at 625-26.
[32] Defendants' Exhibit 47, Declaration of Alex Billioux, MD, DPhil.

regarding mitigation efforts. Dr. Billioux testified that the Governor's executive orders regarding

the restrictions on bar operations were enacted to slow the spread of COVID-19. Dr. Billioux

further explained why the atmosphere of bars is conducive to the spread of COVID-19 and why

bars pose an increased threat to the public health:

> For example, loud music and noisy crowds can cause people to move closer to each other to hear and speak louder, which reduces the physical distance essential to preventing the spread of the virus and increases the risk of infected respiratory droplets being transmitted among patrons. Alcohol consumption is also a cause for concern because drinking requires the removal of masks and intoxicated patrons are likely to experience impaired judgment and loosened inhibitions. As a result, bar patrons are more likely to move closer to each other, speak louder, tell jokes or sing, presenting the same risks of close contact and spread of infected respiratory droplets. The likelihood of these risks materializing is heightened substantially if the bar is poorly ventilated.
>
> All of these factors contribute to a strong likelihood, if not a certainty, of non-compliance with safety practices recommended by the CDC, such as social distancing and mask-wearing, thus creating a disproportionately high risk of increased transmission of COVID-19. Notably, the risks of spreading the virus are not as pronounced in a restaurant, where couples, families, or small groups sit by themselves, socially distant from others eating at a restaurant.[33]

Dr. Billioux also testified that bar patrons are generally younger adults, who are more likely to be

asymptomatic carriers of COVID-19 and therefore more likely to patronize bars without realizing

that they are spreading the virus. Dr. Billioux testified that the State's data showed a dramatic

increase in cases among 18-29-year-olds in Louisiana.[34]

On cross-examination, counsel for Plaintiffs questioned Dr. Billioux regarding why "stand

alone bars" were not permitted to operate while bars within restaurants were allowed to remain

open. Dr. Billioux testified that the intent of the Governor's executive orders was that no bars

could operate as traditional bars serving alcohol in close quarters, even bars within restaurants. In

this testimony, Dr. Billioux referenced regulations provided by the Office of the State Fire

---

[33] Defendants' Exhibit 47, Declaration of Alex Billioux, MD, DPhil, ¶ 43-44.
[34] Defendants' Exhibit 38.

Marshall and set forth on the OpenSafely website; these requirements are specifically referenced in the Governor's executive orders.  These regulations state:

> \* Restaurants, cafes, and coffee shops are limited to 50% of the normal established capacity.
>> \*\* Bar areas of restaurants shall be used for seating/serving purposes only and shall not allow for social gatherings. Service in bar areas must include food items.[35]

The regulations also provide that "customers are required to be seated at tables and not congregating in open areas of the establishment."[36] Dr. Billioux testified that the reason for the distinction between bars and restaurants was their different environments and the different purposes they served. Specifically, in a restaurant setting, individuals sit at tables with their families or close friends rather than mingling among a group of strangers; restaurants also typically do not play loud music which would cause patrons to speak loudly to be heard.

Dr. Billioux also testified regarding the data and recommendations from the White House and the Centers for Disease Control ("CDC"). Specifically, the White House Coronavirus Task Force has repeatedly recommended to the State of Louisiana that bars be closed because of Louisiana's increasing COVID-19 caseload.[37] In addition, Dr. Billioux testified that during the time period when bars were permitted to operate, contact tracing traced a disproportionate number of COVID-19 outbreaks and infections to bars.[38]

Governor Edwards also testified regarding the reasons for his executive orders, specifically the provisions restricting on-site bar service. Governor Edwards testified that his decision to restrict on-site consumption of alcohol at bars was based on advice from his medical advisors,

---

[35] Defendants' Exhibit 45.
[36] *Id.*
[37] Defendants' Exhibits, 13, 14 and 15.
[38] Defendants' Exhibit 19.

recommendation from the White House Coronavirus Task Force, and data from contact tracing.

He testified that:

> Based on the expert opinions of LDH and OPH, there are several reasons why bars are conducive to the spread of COVID-19. First, the experience in a bar is primarily a social one, oftentimes with individuals outside the immediate household. Further, because, by definition, people come to bars to drink alcohol, it is very likely that there will be little to no wearing of face coverings. When music plays in a bar, especially loud music, people tend to move closer to each other to talk and hear, thus reducing the physical distance essential to preventing the spread of the virus. Drinking alcohol in a bar also tends to decrease inhibitions and may thereby cause people to move closer to one another or disregard mask requirements, thereby increasing the risk of the virus spreading, particularly if the par is poorly ventilated. The risk of spreading the virus is not as pronounced in a restaurant, where couples, families, or small groups sit by themselves, socially distant from others eating at the restaurant, and do not necessarily consume alcohol.[39]

Governor Edwards testified that his executive orders were carefully considered and aimed at reducing the spread of COVID-19 in Louisiana.

## IV.
### LEGAL ANALYSIS

### A. *Jacobson*, *Abbott*, and Government Actions Addressing a Public Health Crisis.

Plaintiffs' claims under the Due Process Clause and Equal Protection Clause invoke the well-developed jurisprudence and standards of review governing these types of constitutional claims. However, the government actions challenged here were not taken in ordinary times. In the recent *Abbott* case, the Fifth Circuit held that government actions taken to combat the public health crisis caused by the  COVID-19 pandemic must be judged under the deferential standard adopted in the century-old Supreme Court case of  *Jacobson v. Commonwealth of Mass.,* 197 U.S. 11, (1905).[40] In *Jacobson*, the plaintiff challenged Massachusetts' compulsory vaccination law. The law was enacted in the context of a growing smallpox epidemic. In that 1905 decision, the Supreme

---

[39] Defendants' Exhibit 49, ¶ 30.
[40] *See In re Abbott*, 954 F.3d at 783 (citing *Jacobson*).

9

Court held that government actions taken in the context of a public health crisis are subject to a more deferential review:

> In every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.[41]

The Court explained that the police power of a state "must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."[42] According to the Court, "the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted" in emergency circumstances.[43] The Court further explained that the "liberty secured by the Constitution ... does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."[44] Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."[45]

In *In re Abbott*, the Fifth Circuit held that *Jacobson*'s deferential standard applies to government actions taken to combat the COVID-19 pandemic. Importantly, the court explained that, without question, "***individual rights secured by the Constitution do not disappear*** during a public health crisis, but the [Supreme] Court [has] plainly stated that rights could be ***reasonably restricted*** during those times."[46] The court stated succinctly:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."[47]

---

[41] *Jacobson*, 197 U.S. at 29, 25 S.Ct. 358; *In re Abbott*, 954 F.3d at 784.
[42] *Jacobson*, 197 U.S. at 38.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *In re Abbott*, 954 F.3d at 784 (citing *Jacobson*, 197 U.S. at 29, 25 S.Ct. 358) (emphasis added).
[47] *Id.* at 784 (quoting *Jacobson*, 197 U.S. at 31, 25 S.Ct. 358).

The Court must thus address Plaintiffs' requested relief within contours of *Jacobson* and *Abbott*. The first prong of *Jacobson*'s test is whether the government action challenged "lacks a 'real or substantial relation' to the crisis" faced by the state.[48] The second prong of *Jacobson's* test asks whether the executive orders are "beyond question, in palpable conflict with the Constitution."[49] Plaintiffs concede that the *Jacobson/Abbott* standard is the correct standard. However, they suggest that the standard should be applied differently at this stage of the public health crisis because the circumstances of the pandemic have changed, and the state has better data on the spread of COVID-19. Plaintiffs apparently argue that the Governor's bar-related restrictions should be entitled to less deference than afforded by the Fifth Circuit in *Abbott*. The Court disagrees. *Abbott*'s adoption of *Jacobson*'s deferential standard of review was grounded on the existence of a public health crisis. The record here reflects that this crisis still existed at the time the Governor signed Executive Orders 89 JBE 2020 and 96 JBE 2020. Specifically, the record shows that the number of Louisiana COVID-19 cases has continued to grow.[50] Governor Edwards testified that many hospitals in the state are operating at full capacity, and that the number of hospital beds and ICU beds available pose a significant public health concern. According to the most recent Louisiana State Report from the White House Coronavirus Task Force, Louisiana remains first in the country in the per capita number of COVID-19 cases.[51] Moreover, other courts in Louisiana and elsewhere have continued to apply *Jacobson*'s deferential standard to constitutional claims as the pandemic has progressed.[52]  While more information may be known about COVID-19 than at the time *Abbott*

---

[48] *Id.; In re Abbott*, 954 F.3d at 787.
[49] *Jacobson*, 197 U.S. at 38; *In re Abbott*, 954 F.3d at 787.
[50] Defendants' Exhibit 42.
[51] Defendants' Exhibit 54.
[52] *See, e.g., 4 Aces Ent.*, 2020 WL 4432727; *TJM 64, Inc. v. Harris*, No. 20-cv-2498, 2020 WL 4352756 (W.D. Tenn. July 29, 2000).

was decided, *Abbott*'s deferential standard is still applicable to the Governor's actions in the present case.

**B.   Does the Governor's Mandate Have a "Real or Substantial Relation" to the Crisis?**

The first prong of the *Jacobson/Abbott* framework addresses whether the government actions at issue have a "real or substantial relation" to the present crisis. Under this first prong, this Court "may ask whether the state's emergency measures lack basic exceptions for 'extreme cases,' and whether the measures are pretextual——that is, arbitrary or oppressive."[53] However, the Court "may not second-guess the wisdom or efficacy of the measures."[54] Ultimately, "if the choice is between two reasonable responses to a public crisis, the judgment must be left to the governing state authorities."[55]

The record here reflects a "real and substantial relation" between the Governor's bar-related restrictions and the state's efforts to control the spread of COVID-19. Dr. Billioux's testimony illuminates the unique risks posed by bars in the spread of COVID:  individuals socializing in close contact and ignoring social distancing guidelines while consuming alcohol. Further, the testimony of both Dr. Billioux and Governor Edwards support the distinction between bars and restaurants. According to this testimony, the primary purpose of individuals going to bars is to socialize in close quarters while the primary purpose of individuals going to a restaurant is to eat a meal while sitting at a table. This testimony is supported by the data reflected in the record, recommendations from the White House Coronavirus Task Force, and the recommendations of the Louisiana Department of Health.[56] This testimony is further supported by the data from contact

---

[53] *Abbott*, 954 F.3d at 785.
[54] *Id.*
[55] *Id.* at 792.
[56] *See* Defendants' Exhibits 13, 14, 15 and 42.

tracing that reflects a disproportionate number of outbreaks from bars – as opposed to restaurants – and a wider spread of cases from bar-related outbreaks.[57]

Considering this testimony and the record as a whole, the provisions in Executive Order 89 JBE 2020 and Executive Order 96 JBE 2020 banning on-site consumption of alcohol at bars bears a "real or substantial relation" to the public health crisis resulting from the COVID-19 pandemic.

**C.   Is the Governor's Mandate Beyond Question, in Palpable Conflict with the Constitution?**

The second *Jacobson* inquiry is whether the Governor's executive orders are "beyond question, in palpable conflict with the Constitution." In order to address this inquiry, the Court must examine each of the Plaintiffs' constitutional claims.

**1. Substantive Due Process.**

Plaintiffs first argue that the Governor's actions violate their "substantive due process" rights under the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o person shall be...deprived of life, liberty, or property, without due process of law." Courts have construed the Due Process Clause to include a "substantive" component as well as a "procedural" component.[58] Unlike procedural due process, substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." The substantive component of the clause thus "provides heightened protection against government interference with certain fundamental rights and liberty interests," which are held to a more exacting standard of strict scrutiny.[59] "The conceptual essence of

---

[57] Defendants' Exhibit 34.
[58] *Reyes v. North Texas Tollway Auth*., 861 F.3d 558, 562 (5th Cir. 2017).
[59] *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation and internal quotation marks omitted); *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

'substantive' due process is  the  notion  that  the Due Process Clause—in addition to  setting procedural minima for deprivations of life, liberty, or property—bars outright 'certain government actions regardless of the fairness of the procedures used to implement them.'"[60]

This  framework  imposes  a  threshold  question  for  the  Court:  is  the  right  at  issue  a *fundamental* right? Answering that question requires "a careful description of the asserted fundamental liberty interests," which must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."[61] "Liberty interests may be created under either federal law or state law."[62] Plaintiffs contend that the Governor's executive orders infringe on their property and liberty interests in "owning and operating lawfully established bars."[63] They also contend that the orders interfere with their ability to earn a profit from their businesses. The Supreme Court has observed that, while the assets of a business are unquestionably "property," the "activity of doing business, or the activity of making the profit is not property in the ordinary sense."[64] There is, in short, no "broad 'right to do business" guaranteed by the United States Constitution.[65] As a result, some courts have rejected substantive due process challenges to COVID-19 restrictions on the grounds that a general right to operate a business is not a constitutionally protected right.[66]

---

[60] *Brennan v. Stewart*, 834 F.2d 1248, 1255 (5th Cir. 1988) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

[61] *Glucksberg*, 521 U.S. at 720-21.

[62] *Jennings v. Owens*, 602 F.3d 652, 657 (5th Cir.2010).

[63] *See* Memorandum to Plaintiff's Motion for TRO, pp. 4, 6.

[64] *College Sav. Bank v. Florida Prepaid Postsecondary Education*, 527 U.S. 666, 675, 119 S.Ct. 2219, 2225 (1999).

[65] *See College Sav. Bank*, 527 U.S. at 2225; *see also Pollard v. Cockrell*, 578 F. 2d 1002, 1012 (5th Cir. 1978) (rejecting any notion of a "constitutionally guaranteed to 'pursue a legitimate business'"); *In re: Premier Automotive Services, Inc.*, 492 F. 3d 274, 283 (2007) (finding no constitutionally-guaranteed "right to do business").

[66] For example, in *Xponential Fitness v. Arizona*, the plaintiffs owned fitness centers and asserted that an executive order closing their businesses violated their due process rights. No. 20-01310, 2020 WL 3971908 at *5 (D. Ariz. July 14, 2020). The court disagreed that the order implicated any due process concerns because the "right to do business has not been recognized as a constitutionally-protected property right." *Id.* In *Talleywhacker, Inc. v. Cooper*, the court relied on the same rationale in rejecting the due process claims of owners of entertainment venues in North Carolina who challenged orders closing their business due to COVID-19. No. 20-218, 2020 WL 3051207 at *12 (E.D.N.C. June 8, 2020).

As noted in the *4 Aces* case, however, the caselaw in the Fifth Circuit is not as clear with respect to whether the activity of *earning profits* is a constitutionally protected property interest.[67] Some Fifth Circuit caselaw – including post- *College Savings Bank* caselaw – appears to recognize that the right to earn profits from a business is a protected property right.[68] Moreover, the Fifth Circuit has recognized that "licenses, certificates, and franchises ... qualify as property interests for purposes of procedural due process."[69] This protection reflects the fact that, once issued, a license or permit "may become essential in the pursuit of a livelihood."[70] Here, the Governor's executive order does not revoke or expressly suspend Plaintiffs' licenses to operate bars, but it does restrict Plaintiffs' activities in ways that that would otherwise be permissible under these licenses--indeed, in ways that likely make these licenses less valuable for the duration of the Governor's executive order. Nevertheless, none of this jurisprudence classifies these purely economic rights as "fundamental" rights; in other words, that these rights are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."[71] Accordingly, the provisions of the Governor's executive orders restricting the operation of bars must be judged under a deferential "rational basis" review applicable to economic regulation.[72]

The Governor's actions in connection with the COVID-19 health crisis comport with substantive due process if these actions are rationally related to a legitimate government interest.[73] Only if such government action is "clearly arbitrary and unreasonable, having no substantial

---

[67] *4 Aces Enter., LLC,* 2020 WL 4747660 at * 11.
[68] *Id.*
[69] *Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n,* 547 F.2d 938, 941 (5th Cir. 1977).
[70] *Bell v. Burson,* 402 U.S. 535, 539 (1971).
[71] *Glucksberg*, 521 U.S. at 720-21.
[72] *See Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) (if a right is not fundamental, then the law that allegedly burdens the right is ordinarily subject to rational basis review).
[73] *Schafer v. City of New Orleans*, 743 F.2d 1086, 1089 (5th Cir. 1984);  *Couf v. DeBlaker*, 652 F.2d 585, 588 (5th Cir.1981), *cert. denied*, 455 U.S. 921 (1982); *Stone v. City of Maitland*, 446 F.2d 83, 87 (5th Cir. 1971).

relation to the public health, safety, morals, or general welfare," may it be declared unconstitutional.[74] Under this standard, the Court must start its analysis with a strong presumption of constitutional validity.[75]

As recognized by *Jacobson* and *Abbott*, government actions taken to combat a public health crisis are a legitimate government interest.[76] The Governor's bar-related restrictions in his executive orders are rationally related to that legitimate government interest: specifically, addressing the public health crisis in Louisiana caused by the COVID-19 pandemic. The record reflects that:

- The Louisiana Department of Health and Dr. Billioux reviewed and considered COVID-19 trends leading up to the issuance of Executive Orders 89 JBE 2020 and 96 JBE 2020 and advised the Governor on those trends;[77]

- These trends showed a high incidence of COVID-19 among younger age groups that frequent bars at a higher rate than other age groups;[78]

- Case tracing data shows a disproportionate number of COVID-19 outbreaks traced to bars, and these outbreaks also resulted in a high level of cases;[79]

- Dr. Billioux and the Governor also considered the fact that the environment of most bars is conducive to the spread of COVID-19;[80]

---

[74] *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Shelton*, 780 F.2d at 483 ("Only if the governmental body could have had no legitimate reason for its decision" is federal judicial interference proper.).
[75] *Flores–Ledezma v. Gonzales*, 415 F.3d 375, 381 (5th Cir.2005)(citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)).
[76] *Abbott*, 954 F.3d at 784.
[77] Declaration of Alex Billioux, ¶¶30-39, Defendants' Exhibit 47.
[78] *Id.*
[79] Defendants' Exhibit 34.
[80] *See* Declaration of Alex Billioux, ¶43, Defendants' Exhibit 47 and Declaration of Governor John Bel Edwards, ¶31, Defendants Exhibit 49.

- Dr. Billioux also pointed to a study conducted in a foreign COVID-19 hotspot highlighting the risk of bars and nightclubs in the spread of COVID-19, and this study factored in his recommendation that the Governor temporarily restrict the operation of bars;[81] and

- The Governor considered the recommendation of the White House Coronavirus Task Force that the operation of bars be restricted.[82]

Taken as a whole, this evidence supplies a rational basis for the Governor to conclude that restrictions on on-site bar service would aid in stemming the upward trend in COVID-19 cases. Plaintiffs challenge the contact tracing data relied on by the Governor and Dr. Billioux, but their arguments do not negate that data as one of the grounds for the Governor's orders. Specifically, Plaintiffs allege that the number of cases traced to bars -- 464 -- is only 0.45% of the total number of COVID-19 cases in Louisiana. However, Dr. Billioux testified that the Louisiana Department of health could only contact trace 2212 cases, and that the number of cases traced to bars was a much higher 21% of *traceable* cases.[83] Dr. Billioux opined that these results suggest a much higher incidence of COVID-19 cases originating from bars.[84] Plaintiffs also have not negated the other data, research, and other factors in the record that the Governor considered when he adopted Executive Orders 89 JBE 2020 and 96 JBE 2020. This is critical because "those attacking the rationality of the [law] have the burden to negate every conceivable basis which might support it."[85]

---

[81] See testimony of Alex Billioux.
[82] Declaration of Governor John Bel Edwards, ¶33.
[83] *See* Declaration of Alex Billioux, ¶43, Defendants' Exhibit 47.
[84] *Id.*
[85] *Lynch*, 826 F.3d at 196 (citing *Beach Commc'ns*, 508 U.S. at 314–15, 113 S.Ct. 2096). "In other words, where there are plausible reasons for the rule, [the court's] inquiry is at an end." *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 313–14, 113 S.Ct. 2096).

In sum, Plaintiffs are not likely to prevail on their substantive due process claim. Under the *Jacobson/Abbott* framework, Plaintiffs have not shown that the bar-related provisions in the Governor's orders are "beyond question, in palpable conflict with the Constitution" based on the standards that the Court must apply in evaluating a substantive due process claim involving economic regulations.

### 2. Procedural Due Process.

Procedural due process under the Fourteenth Amendment "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."[86] To prevail on a procedural due process claim, "a plaintiff must show (1) that he suffered a deprivation of a constitutionally protected interest in 'life, liberty, or property,' and (2) that such deprivation occurred without due process of law."[87] Thus, as with Plaintiffs' substantive due process claim, they must show that the property interest at issue here is a constitutionally cognizable property interest. As explained in connection with Plaintiffs' substantive due process claim, there is some support for Plaintiffs' claim that their right to operate according to their bar licenses and their right to earn profits from their businesses may be entitled to constitutional protection.[88] The Court need not decide this question in the context of this case because, such protection notwithstanding, the Supreme Court has determined that "summary administrative action may be justified in emergency situations."[89] A "deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action."[90] COVID-19

---

[86] *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[87] *Vincent*, 28 F.Supp.3d at 637 (quoting *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990))
[88] *See 4 Aces Ent.*, 2020 WL 4747660 at *11.
[89] *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 300 (1981) (citations omitted).
[90] *Id.* (citations omitted).

is, without a doubt, an unprecedented emergency. Accordingly, Plaintiffs are not likely to prevail on their procedural due process claim.

### 3. Equal Protection.

Plaintiffs next assert that Executive Orders 89 JBE 2020 and 96 JBE 2020 violate the Equal Protection Clause of the Fourteenth Amendment. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."[91] The Supreme Court has "repeatedly held that 'a classification neither involving fundamental rights nor proceeding along suspect lines ... cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'"[92] As commercial business owners, Plaintiffs do not fall within a suspect or quasi-suspect class.[93]  The Governor's bar-related restrictions are therefore subject to a rational basis standard of review.[94]  Under a rational basis standard, the Court must presume that the Governor's executive orders are constitutional and require Plaintiffs to "negate every conceivable basis which might support those orders."[95] Further, the Governor's action "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."[96]

---

[91] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985) (quoting *Plyler*, 457 U.S. at 216, 102 S.Ct. 2382).

[92] *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 127–28 (1999) (alteration in original) (citations omitted); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) ("To withstand Fourteenth Amendment scrutiny, a statute is required to bear only a rational relationship to a legitimate state interest, unless it makes a suspect classification or implicates a fundamental right." (citations omitted)).

[93] *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207 at *8–9 (E.D.N.C. June 8, 2020)

[94] *Id.*

[95] *Armour v. City of Indianapolis*, 566 U.S. 673, 681, 132 S.Ct. 2073 (2012).

[96] *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).

Plaintiffs argue that there is no rational basis to distinguish between bars holding AG permits and those holding AR permits and that the Governor's executive orders run afoul of the Equal Protection Clause by making this distinction. The Louisiana Office of Alcohol and Tobacco Control provides for a "Class A-General" or "AG permit", and a "Class A-Restaurant" or "AR permit."[97] Plaintiffs argue that some establishments are actually what would traditionally be classified as bars but, because a certain portion of their sales are from food rather than alcohol, they are able to obtain AR permits and essentially operate as a restaurant. Plaintiffs argue that the distinction between the two types of businesses is arbitrary because AG permitted bars present the same COVID-19 risks as AR permitted restaurants with full-service bars. While there is a difference in treatment between the two types of businesses, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect."[98] Indeed, "[i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'"[99]

In *TJM 64, Inc. v. Harris*,  2020 WL 4352756  (W.D. Tenn. July 29, 2020), the court addressed distinctions made between different types of bars and bars in restaurants. There, the plaintiffs alleged that not all facilities that served alcohol were required to close and argued that bars, pubs, and restaurants on Beale Street and other "heavily trafficked 'tourist' areas of Memphis and Shelby County were untouched by the Order" in violation of their equal protection rights.[100] In *TJM 64*, the defendants also made distinctions based upon the amount of food sales in relation

---

[97] *See* La. Rev. Stat. §26:71.1.
[98] *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008).
[99] *Id.* (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).
[100] *Id.*

to alcohol sales for their differing treatment of these businesses.[101] The court there concluded that the distinction was not arbitrary and had a real and substantial relation to addressing the public health emergency.[102] The court in *TJM* also found that assessing the circumstances of each bar and restaurant on a case by case basis would be overly burdensome and concluded that:

> [th]e role of the Court is not to second guess whether Defendants made the right decision in using this 50% food sales distinction. The Court's role is to determine whether Defendants' decision is reasonably related to the legitimate government goal of fighting the COVID-19 virus. *See Whitmer*, —— Fed.Appx. at ——, 2020 WL 3468281, at *3 ("[T]he Governor's order need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19. Shaping the precise contours of public health measures entails difficult line-drawing. Our Constitution wisely leaves that task to officials directly accountable to the people." (internal citations omitted)). Shelby County's Order is reasonably related to the legitimate government goal of fighting the COVID-19 virus.[103]

The Jacobson framework is not toothless; some courts applying the standard have ruled that COVID-19 restrictions are unconstitutional.  For example, Plaintiffs rely on the court's ruling in *DiMartile v. Cuomo*, 2020 WL 4558711 (N.D. NY 2020), granting injunctive relief to a group of wedding planners who challenged New York's restrictions on gatherings exceeding 50 people. The court in *DiMartile* found that the state's 50-person restriction on social gatherings is impermissibly arbitrary under the facts of the case.[104] The court there reasoned that since the same facilities used by plaintiffs for weddings were permitted to operate for other purposes – such as restaurants – that did not have the same limitations, there was no rational basis to distinguish between different types of social gatherings at the same facilities.[105] Plaintiffs argue that *DiMartile* requires a similar finding here.

---

[101] *Id.*
[102] *Id.* at *4.
[103] *Id.*
[104] *Id.* at *9.
[105] *Id.*

The Court disagrees because *DiMartile* is distinguishable. The point of *DiMartile* is that because the same facilities were being used for different types of events, the state had no rational basis to conclude that one type of event was any more risky than another type of event held at the same facility.[106]   In contrast, the Governor's classification here is based on evidence that the environment of a facility operated as a bar poses a *greater* danger of COVID-19 transmission than a facility operating as a restaurant with a bar area. According to the Governor, bars in restaurants cannot operate as true bars, they may only be used for food service. There was no such distinction in *DiMartile*.[107]

As indicated above, both Dr. Billioux and Governor Edwards testified regarding the reasons behind the different treatment of bars and restaurants, including:

- the primary purpose of individuals going to bars is to socialize while the primary purpose of individuals going to a restaurant is to eat a meal;

- bars typically play loud music, forcing patrons to congregate and speak loudly to be heard;

- bar patrons generally consume alcohol, which requires them to remove their facemasks;

- alcohol also lowers inhibitions and judgment;

---

[106] *Id.*

[107] In their briefs and in their arguments at the hearing, Plaintiffs cite *Mikeska v. City of Galveston*, 451 F.3d 376 (5th Cir. 2006) as a case "squarely on point" to the present case. (See Plaintiffs' Reply Brief at 8). The Court disagrees. In *Mikeska*, beachfront homeowners filed a § 1983 action alleging that the City's refusal to permit them to repair and maintain their homes or to access municipal utility and sewer services following a tropical storm violated their due process and equal protection rights. 451 F.3d at 379. The City's actions were taken after a tropical storm hit the area; but these actions were not directly connected to an immediate, ongoing public health and safety crisis. Rather, the actions were purportedly based on the City's powers under the Texas Open Beaches Act in the aftermath of the storm. Id. at 378. Accordingly, the court in *Mikeska* was not applying the *Jacobson* standard applicable to an ongoing public health emergency.

- bar patrons generally fall within a younger age group that is more likely to be asymptomatic, increasing the likelihood that they could spread the virus;

- in contrast to bars, patrons of restaurant and bars that serve food tend to sit at table in groups and do not move freely around the restaurant; and

- White House guidance highlights the public health danger of bars as opposed to restaurants.[108]

The Governor's attempt to draw distinctions between restaurants, AG bars, and AR bars may be imperfect. Plaintiffs also point to evidence that these restrictions are imperfectly enforced and that many restaurants and AR bars are operating in violation of the Governor's executive orders. Nevertheless, under *Abbot* and *Jacobson*, it is not the role of this Court to second-guess the classifications and distinctions made in the Governor's orders as long as the bar-related restrictions in those orders bear a "real or substantial relation" to the goal of slowing the spread of COVID-19 and are not "beyond all question" a violation of Plaintiffs' equal protection rights. In order to carry this burden, Plaintiffs must negate "every conceivable basis which might support" the classification. *Lynch*, 826 F.3d at 196 (citing *Beach Commc'ns*, 508 U.S. at 314–15). "In other words, where there are plausible reasons for the rule, [the court's] inquiry is at an end." *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 313–14). Plaintiffs have not met this burden based on the record before the Court. They have not, therefore, shown that they are likely to succeed on the merits of their equal protection claims.

---

[108] *See* Defendants' Exhibit 49, Declaration of Governor John Bel Edwards, ¶ 30 and Defendants' Exhibit 47, Declaration of Alex Billioux, MD, DPhil, ¶ 43-44.

### 4.  State Law Arguments.

Plaintiffs also urge this Court to find that the Governor's executive orders fail the *Jacobson* substantial relation inquiry because they violate state law. Plaintiffs specifically state that they are not asking the Court to make a declaration that the orders violate state law because the Court has no authority to do so under *Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89, 104 (1984). Under the Eleventh Amendment, a plaintiff can only file suit in federal court seeking prospective, injunctive relief against state officials for "violations of federal law."[109] Counsel for Plaintiffs does not dispute this limitation but rather argues that the Court should find that the Governor's executive orders nevertheless fail the *Jacobson* test because they were enacted without appropriate state authority. The Court declines this request. Whether a state executive's actions are authorized under state law has no relevance to the inquiry under *Jacobson* and *Abbott*.[110] To the extent that Plaintiffs wish to argue that the Governor's orders violate state law, a Louisiana state court is the appropriate forum to seek that relief.[111]

### D.  <u>The Other Requirements for Injunctive Relief</u>.

Because Plaintiffs have not established that they are likely to succeed on the merits, the Court will not address the other requirements for injunctive relief.

* * *

The Court is sympathetic to the harm suffered by these plaintiffs as a result of the COVID-19 pandemic.  This pandemic has imposed tremendous, often unprecedented burdens on the country's healthcare system, schools, economy, and daily life. Many individuals and small

---

[109] *Timpanogos Tribe v. Conway*, 286 F. 3d 1195, 1205 (10th Cir. 2002) (citing *Ex Parte Young*, 209 U.S. 123, 159-160 (1908)).

[110] *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174-75 (5th Cir. 1996) ("Converting alleged violations of state law into federal...due process claims improperly bootstraps state law into the Constitution").

[111] The Court has received an Amicus Curiae brief from a group of Louisiana legislators expressing concerns that Governor Edwards has acted without appropriate state authority. However, Plaintiffs have made it clear that they are not asking this Court to make such a declaration in light of the Court's lack of jurisdiction under *Pennhurst*.

business owners have suffered disproportionate losses.   Nevertheless, the Governor's actions challenged in the present case must be judged under the standard articulated in *Jacobson* and *Abbott*.   Under this standard, it is not this Court's role to second guess the policy choices made by the Governor.   Those policy decisions must be judged in the political arena.   In our system, the ultimate checks against the policy choices of our political leaders are elections.   As another Court has noted, "[c]rises like COVID-19 can call for quick, decisive measures to save lives. Yet those measures can have extreme costs—costs that often are not borne evenly. The decision to impose those costs rests with the political branches of government."[112] Moreover, as the Court has explained, *Jacobson*'s standard is not toothless. Courts tend to give greater scrutiny to measures that infringe on fundamental rights even in the context of a public health crisis.[113] Here, because the Governor's executive orders satisfy the standards set forth in *Jacobson* and *Abbott,* Plaintiffs' Motion for a Preliminary Injunction is **DENIED**.

THUS DONE in Chambers on this 21st day of August, 2020.

_____
ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[112] *League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125 2020 WL 3468281 (6th Cir. June 24, 2020).
[113] *See, e.g., Ramsek v. Beshear*, 2020 WL 3446249 (E.D. Ky. June 24, 2020) (enjoining restrictions on First Amendment speech); *Soos v. Cuomo*, 2020 WL 3488742 (N.D. N.Y. June 26, 2020) (enjoining restrictions on church services).