# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 04, 2021

Ms. Carol L. Michel
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

Mr. Tony R. Moore
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

          No. 20-30526   Big Tyme Investments v. Edwards
                         USDC No. 2:20-CV-2150
                         USDC No. 6:20-CV-965

Dear Ms. Michel, and Mr. Moore,

Enclosed is a copy of the judgments issued as the mandate and a
copy of the court's opinion.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Majella A. Sutton, Deputy Clerk
                              504-310-7680

cc:
     Mr. Matthew F. Block
     Mr. Christopher T. Chocheles
     Mr. Jimmy Roy Faircloth Jr.
     Mr. Joshua Simon Force
     Mr. James M. Garner
     Mr. Glenn L. Langley
     Mr. Richard Frederick Norem III
     Ms. Mary Katherine Price
     Mr. Jack M. Weiss

# United States Court of Appeals for the Fifth Circuit

Certified as a true copy and issued
as the mandate on Feb 04, 2021

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2021

Lyle W. Cayce
Clerk

No. 20-30526

BIG TYME INVESTMENTS, L.L.C., *doing business as* BIG DADDY'S PUB & GRUB; CD ENTERPRISES OF HOUMA, L.L.C., *doing business as* LARUSSA'S LOUNGE; JOM, L.L.C., *doing business as* JUST ONE MORE; LONGSHOTZ 1, L.L.C., *doing business as* LONGSHOTZ; PARADISE SPORTS BAR & DAIQUIRIS, L.L.C., *doing business as* EPIC LOUNGE; R&J LAPEYROUSE, L.L.C., *doing business as* JEAUX'S NEW HORIZON; R. HEASLEY, L.L.C., *doing business as* RAM ROD'S SALOON; TAP DAT, L.L.C., *doing business as* THE BRASS MONKEY; THE MUSIC COVE, L.L.C.; THE OUTER LIMITS BAR, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA; H. BROWNING, JR., IN HIS OFFICIAL CAPACITY AS FIRE MARSHAL OF THE STATE OF LOUISIANA, *also known as* BUTCH BROWNING,

*Defendants—Appellees*,

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-2150

_____

Before DENNIS, HIGGINSON, and WILLETT, *Circuit Judges*.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that each party to bear own costs on appeal to be taxed by the Clerk of this Court.

2



# United States Court of Appeals
# for the Fifth Circuit

**Certified as a true copy and issued
as the mandate on Feb 04, 2021**

Attest:
*Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2021

Lyle W. Cayce
Clerk

—————————————

No. 20-30537

—————————————

910 E Main, L.L.C., *doing business as* Quarter Tavern; Doug
McCarthy Enterprises, Incorporated, *doing business as* 501;
My Place Bar & Grill, L.L.C.; Pool Dos Sports Bar,
L.L.P.; SoCo Sports Bar, L.L.C.; Sandi's Anchor Lounge,
L.L.C., *doing business as* Da Camp; Tipsy Cajun, L.L.C.;
Wanous, L.L.C., *doing business as* AJ's 2nd St. Pub; C K B C P B
5, L.L.C., *doing business as* Chatter Box; Big Dan's Bar,
Incorporated; City Bar, Incorporated,

*Plaintiffs—Appellants*,

*versus*

John Bel Edwards, In his official capacity as Governor
of the State of Louisiana; H. Browning, Jr., In his
official capacity as Fire Marshal of the State of
Louisiana, *also known as* Butch Browning,

*Defendants—Appellees*.

—————————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-965

—————————————————————————

Before DENNIS, HIGGINSON, and WILLETT, *Circuit Judges*.

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that each party to bear own costs on appeal to be taxed by the Clerk of this Court.

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2021

Lyle W. Cayce
Clerk

No. 20-30526

BIG TYME INVESTMENTS, L.L.C., *doing business as* BIG DADDY'S
PUB & GRUB; CD ENTERPRISES OF HOUMA, L.L.C., *doing business
as* LARUSSA'S LOUNGE; JOM, L.L.C., *doing business as* JUST ONE
MORE; LONGSHOTZ 1, L.L.C., *doing business as* LONGSHOTZ;
PARADISE SPORTS BAR & DAIQUIRIS, L.L.C., *doing business as*
EPIC LOUNGE; R&J LAPEYROUSE, L.L.C., *doing business as*
JEAUX'S NEW HORIZON; R. HEASLEY, L.L.C., *doing business as*
RAM ROD'S SALOON; TAP DAT, L.L.C., *doing business as* THE
BRASS MONKEY; THE MUSIC COVE, L.L.C.; THE OUTER
LIMITS BAR, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

JOHN BEL EDWARDS, *in his official capacity as Governor of the State of
Louisiana*; H. BROWNING, JR., *in his official capacity as Fire Marshal of
the State of Louisiana*, *also known as* BUTCH BROWNING,

*Defendants—Appellees*,

CONSOLIDATED WITH

No. 20-30537

910 E MAIN, L.L.C., *doing business as* QUARTER TAVERN; DOUG
MCCARTHY ENTERPRISES, INCORPORATED, *doing business as* 501;
MY PLACE BAR & GRILL, L.L.C.; POOL DOS SPORTS BAR,

c/w No. 20-30537

L.L.P.; SoCo Sports Bar, L.L.C.; Sandi's Anchor Lounge, L.L.C., *doing business as* Da Camp; Tipsy Cajun, L.L.C.; Wanous, L.L.C., *doing business as* AJ's 2nd St. Pub; C K B C P B 5, L.L.C., *doing business as* Chatter Box; Big Dan's Bar, Incorporated; City Bar, Incorporated,

*Plaintiffs—Appellants*,

*versus*

John Bel Edwards, *in his official capacity as Governor of the State of Louisiana*; H. Browning, Jr., *in his official capacity as Fire Marshal of the State of Louisiana*, *also known as* Butch Browning,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-2150

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-965

---

Before Dennis, Higginson, and Willett, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

In this consolidated appeal, 21 bar owners in Louisiana challenge the Governor's restrictions to the operation of bars in response to COVID-19 (the "Bar Closure Order"). The Bar Closure Order prohibited on-site consumption of alcohol and food at "bars," but permitted on-site consumption of alcohol and food at "restaurants." Two district courts below denied the bar owners' motions for preliminary injunctive relief. The bar owners timely appealed, arguing only that the Bar Closure Order's

No. 20-30526
c/w No. 20-30537

differential treatment of bars violates the Equal Protection Clause of the
Fourteenth Amendment. We AFFIRM.

## I. BACKGROUND

### A. The Governor's emergency proclamations

As all are painfully aware, in early 2020 our nation was gripped with
an unprecedented public health emergency caused by COVID-19. On March
11, 2020, the World Health Organization ("WHO") declared a global
pandemic in response to the spread of COVID-19. Louisiana, like the rest of
the United States, was no exception. By mid-March, the state reported the
"fastest growth rate of confirmed [COVID-19] cases in the world," and
ranked third in per capita cases within the United States.

Since March, cases have continued to increase. At the time this appeal
was taken, the United States had recorded over 5 million confirmed cases and
over 160,000 deaths from COVID-19, and Louisiana had recorded nearly
130,000 cases and over 4,000 deaths. To date, the United States has
recorded over 22.5 million cases and over 375,000 deaths from COVID-19,
and Louisiana has reported 352,939 cases and 7,971 deaths.[1]

The same day as the WHO's declaration, Louisiana Governor John
Bel Edwards declared the pandemic a statewide public health emergency.[2] In

---

[1] *Coronavirus Disease 2019 (COVID-19): Cases and Deaths by State*, Ctrs. for
Disease     Control     &     Prevention,     https://covid.cdc.gov/covid-data-
tracker/#cases_casesper100klast7days (last visited Jan. 12, 2021); *Louisiana Coronavirus
Information*, Louisiana Dep't of Health, https://ldh.la.gov/coronavirus/ (last visited Jan.
12, 2021).

[2] The Governor issued the first emergency proclamation pursuant to the Louisiana
Health Emergency Powers Act, LA. R.S. 29:760. A group of Louisiana legislators, in an
amicus brief, asserts that the Governor has exceeded his authority under that law and the
Louisiana constitution. However, the bar owners do not challenge the Governor's authority
to issue emergency proclamations. We need not address amici's arguments—which they

No. 20-30526
c/w No. 20-30537

the months that followed, the Governor issued a series of proclamations to slow the spread of COVID-19. The earliest of these proclamations prohibited gatherings of ten or more people and shuttered most "nonessential businesses," including closing bars and restricting restaurants to take-out and delivery only. *See* La. Exec. Dep't, Proclamation No. 30 JBE 2020, §§ 2–3 (Mar. 16, 2020); Proclamation No. 33 JBE 2020, §§ 2, 4 (Mar. 22, 2020).

The Governor subsequently announced that businesses would reopen in phases. Consistent with guidelines from the White House Coronavirus Task Force, each phase was tied to gating criteria based on the state's total number of cases, positivity rates, and hospital capacity. In mid-May, as the state's COVID-19 cases and hospitalizations decreased, the Governor announced "Phase 1" of reopening Louisiana's businesses. *See* La. Exec. Dep't, Proclamation No. 58 JBE 2020 (May 14, 2020). Under Phase 1, businesses were permitted to reopen subject to distancing and capacity limitations as determined by the state's Fire Marshal. The proclamation included a link to the state's "Open Safely" website where the Fire Marshal's guidance was published. Under Phase 1, restaurants and bars with approved food-service permits could reopen at 25% capacity, though bars without a food license remained closed.

In June, the Governor moved Louisiana into "Phase 2," which allowed bars *without* food service permits to reopen at 25% capacity, and bars *with* food service permits to operate at 50% of capacity subject to additional guidance and restrictions from the Fire Marshal. La. Exec. Dep't,

---

concurrently raised in a separate proceeding in state court—because they are not properly before us in this appeal. Moreover, whether the Governor acted within his authority is purely an issue of state law, and federal courts are without jurisdiction to enjoin enforcement of an executive order allegedly issued in violation of state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984).

No. 20-30526
c/w No. 20-30537

Proclamation No. 74 JBE 2020, § 2(G)(1) (June 4, 2020). These provisions initially expired on June 26, 2020, but were extended by the Governor's subsequent proclamation until July 24, 2020, "unless terminated sooner" based on changes in COVID-19 cases and healthcare capacity. That is precisely what happened.

**B. The challenged Bar Closure Order**

Beginning in July, "the COVID-19 situation in Louisiana had steadily worsened" and the state showed increased cases, positivity rates, and hospitalizations. Unlike the initial March and April surges which were limited to urban "hot spots," the new cases were increasing statewide, including in rural parishes and within younger age groups. These trends were consistent with data in states "across the Sun Belt" and reports from the White House Coronavirus Task Force.

As a result, on July 11, 2020, the Governor issued new "Phase 2 mitigation measures" which included the Bar Closure Order challenged here. La. Exec. Dep't, Proclamation No. 89 JBE 2020 (July 11, 2020). The Bar Closure Order prohibited *on-premises consumption* in bars:

> No bar, with or without a food service permit from the Louisiana Department of Health, shall allow for on premises consumption of any food or drinks. However, any bar shall be allowed to provide for takeout through drive-thru or curbside delivery, including alcoholic beverages.

*Id.* § 2.[3] By contrast, "restaurants" were permitted to continue dine-in service at 50% capacity, subject to "applicable guidance from the State Fire

---

[3] The "Bar Closure Order" refers only to the proclamation's provisions affecting bars. Other portions of the proclamation restricted gatherings to "no more than 50 people," and mandated that "businesses or organizations . . . require all persons who enter

No. 20-30526

c/w No. 20-30537

Marshal published at opensafely.la.gov." La. Exec. Dep't, Proclamation No. 96 JBE 2020, § 2(B)(2), (D)(1) (July 23, 2020). The revised Fire Marshal guidance restricted restaurants to "50% of the normal established capacity" and noted that "[b]ar areas of restaurants shall be used for seating/serving purposes only and shall not allow for social gatherings." Additionally, the guidance required that "[s]ervice in bar areas must include food items."

None of these proclamations defines "bar," nor does Louisiana law. Instead, the state regulates businesses through its Office of Alcohol and Tobacco Control ("ATC"), which provides liquor permits in primarily two categories: "Class A-General" ("AG") and "Class A-Restaurant" ("AR").[4] AG permits are primarily for bars: the establishment can sell alcohol but is not required to sell food, and unlike AR establishments, minors under the age of 18 are not permitted on the premises. *See* La. Rev. Stat. § 26:71.1(1)(d). AR permits are primarily for restaurants and restaurant-bars: the business must meet the statutory criteria for "restaurant establishments," including that its "average monthly revenue from food and nonalcoholic beverages exceeds 50 percent of its total average monthly revenue." La. Rev. Stat. § 26:73(C)(1)(a).

The bar owners assert that the Bar Closure Order effectively defines "bars" as businesses with AG permits. While the Governor denies that he intended to distinguish between "stand-alone" bars and restaurant-bars, the revised Fire Marshal's guidance does just that. Specifically, it included a letter from the ATC Commissioner noting that "all bars or businesses

---

the premises to wear a face covering." *Id.* §§ 3, 4. Neither of those restrictions is challenged here.

[4] The ATC also provides "conditional" AR permits. These permits allow AG-permitted entities to operate like an AR-permitted establishment if they meet the specified requirements of "restaurant establishments." *See* La. Rev. Stat. § 26:71.1(4).

No. 20-30526
c/w No. 20-30537

holding a Class A-General permit, with or without a food service permit . . . shall be required to close." A subsequent letter advised that bars could apply for "Restaurant Conditional Permits," or conditional AR permits, under which they could "operate under the guidelines issued to restaurants."

## C. Procedural History

Appellants (the "bar owners") are 21 businesses that operate bars in the Eastern and Western Districts of Louisiana. At the time the Governor issued the Bar Closure Order, each bar operated with an AG permit; since the filing of this appeal at least five have obtained conditional AR permits.

The bar owners filed identical suits in the Eastern and Western Districts of Louisiana seeking to enjoin the Governor and Fire Marshal (the "appellees") from enforcing the Bar Closure Order.[5] Following expedited evidentiary hearings, both Judge Feldman in the Eastern District and Judge Summerhays in the Western District denied the bar owners' motions for preliminary injunctive relief because they were unlikely to succeed on the merits of their due process and equal protection claims.

The evidentiary hearings focused on the testimony of Dr. Alexander Billioux, the Assistant Secretary of the Office of Public Health of the Louisiana Department of Health. The Governor also testified before the Western District.

Both district courts agreed with the bar owners that the Bar Closure Order classified businesses based on whether they had an AG or AR permit,

------

[5] The complaints sought declaratory and injunctive relief under *Ex Parte Young* and damages based on the Due Process, Equal Protection, and Takings Clauses of the Fifth and Fourteenth Amendments, as well as state-law takings claims. The bar owners then moved for preliminary injunctive relief based on their due process and equal protection claims. On appeal, they raise only their equal protection claim.

No. 20-30526
c/w No. 20-30537

but concluded that this differential treatment was not unconstitutional. In finding that the Governor's Bar Closure Order was rationally related to the goal of protecting public health, both district courts primarily relied on the testimony of Dr. Billioux, who provided the following justifications for closing bars:

- The "primary purpose" of bar goers is "to socialize"; bars often have loud music, which requires their patrons to "move closer to each other"; and with increased intoxication, patrons are "less likely to maintain appropriate social distance and to wear masks."

- Bar patrons are "younger adults" who are "more likely to be asymptomatic carriers of COVID-19 and therefore more likely to patronize bars without realizing that they are spreading the virus." Relatedly, state data also "showed a dramatic increase in cases among 18-29-year-olds."

- Despite limited data, statewide contact tracing linked a significant percentage of COVID-19 cases to bars.

- The White House and CDC recommended closing bars, and the White House Coronavirus Task Force "repeatedly recommended to the State of Louisiana that bars be closed because of Louisiana's increasing COVID-19 caseload."

- Reports showed that foreign countries, including South Korea and the United Kingdom, were successful in controlling the spread of COVID-19 by shutting down "bars and nightclubs."

By contrast, Dr. Billioux testified that the "primary purpose" of restaurant-goers is to "sit at a table with one group" and "eat[] a meal." The Governor similarly testified that these different environments motivated his decision to close bars, but that the "risk of spreading the virus is not as pronounced in a restaurant, where couples, families, or small groups sit by themselves, socially distant from others eating at the restaurant." This, too,

No. 20-30526
c/w No. 20-30537

was consistent with recommendations from the White House Coronavirus Task Force and guidance issued by other states. For example, one report from the California Department of Health detailed the increased risks posed by patrons in bar settings. The Governor testified that these reports similarly informed the Bar Closure Order in Louisiana.

The bar owners appealed only their equal protection claim. They do not challenge the "stated goal of protecting the public by closing bars," but rather only "whether the differential classification of bars is rationally related to that goal."

## II. STANDARD OF REVIEW

We have jurisdiction to review denials of preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). We review the denial of a preliminary injunction for abuse of discretion. *Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017) (per curiam). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* at 403.[6]

A preliminary injunction is warranted only "if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (internal quotation marks omitted). "A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has clearly

---

[6] The Eastern District of Louisiana also denied permanent injunctive relief. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review the denial of permanent injunctive relief for abuse of discretion under the same standards. *Regions Bank of La. v. Rivet*, 224 F.3d 483, 488 (5th Cir. 2000).

No. 20-30526
c/w No. 20-30537

carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (internal quotation marks and citation omitted).

Only the first prong—the likelihood of success on the merits of the bar owners' equal protection claim—is at issue in this appeal. "If the party requesting a preliminary injunction *cannot* show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction." *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003)).

## III. MOOTNESS

While this appeal was pending, appellees moved to dismiss the appeal as moot because the Bar Closure Order was superseded by the Governor's "Phase 3" proclamations.[7] "Whether an appeal is moot is a jurisdictional matter, since it implicates the Article III requirement that there be a live case or controversy." *United States v. Heredia-Holguin*, 823 F.3d 337, 340 (5th Cir. 2016) (en banc) (quoting *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987)). A matter is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks and citation omitted).

Appellees argue that, as recently articulated by our court, "a case challenging a statute, executive order, or local ordinance usually becomes

---

[7] At the time the bar owners filed suit at the end of July 2020, the Bar Closure Order was set to expire on August 6, 2020. The Governor, in two subsequent proclamations, renewed the challenged restrictions until September 11, 2020, which thus remained in effect until after the district courts denied injunctive relief and the bar owners initiated this appeal.

No. 20-30526
c/w No. 20-30537

moot if the challenged law has expired or been repealed." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). Moreover, they say that each of the appellant bars can now reopen, albeit still at lower capacity than restaurants. The bar owners counter that the Phase 3 orders perpetuate the same differential treatment between "bars" and "restaurants" as the challenged Bar Closure Order. We agree that the bar owners' equal protection claim is not moot.

Under Phase 3, which began on September 11, 2020, "bars" can reopen for on-premises consumption at 25% capacity. La. Exec. Dep't, Proclamation No. 117 JBE 2020, § 2(B)(3) (Sept. 11, 2020). However, such reopening was subject to the parish maintaining a 5% positivity rate for two consecutive weeks and that parish affirmatively allowing on-premises consumption in bars to resume. *Id.* "Restaurants," in turn, can operate at 75% capacity, subject to the applicable Fire Marshal guidance but not the additional parish-based restrictions. *Id.* § 2(D)(1).[8]

Both parties rely on our court's recent decision in *Spell v. Edwards*, which dismissed as moot a Louisiana pastor's challenge to the first stay-at-home order's ten-person restriction on in-person gatherings. 962 F.3d at 177. During the pendency of that appeal, the stay-at-home order expired and was

---

[8] We heard oral argument on whether the Phase 3 restrictions mooted the appeal. After this appeal was submitted, the Governor subsequently tightened restrictions once again based on the "alarming and steep rise in cases, test positivity, hospitalizations, and deaths," and an increasing "third surge of COVID-19" within the state. La. Exec. Dep't, Proclamation No. 168 JBE 2020 (Nov. 24, 2020). Pursuant to this "modified" Phase 2 order, "bars" are prohibited from indoor, on-premises consumption but may remain open for outdoor service with limited capacity, subject to the additional positivity rate and opt-in requirements announced in Phase 3. *Id.* § 2(B). "Restaurants," however, can continue to provide indoor service at 50% capacity. *Id.* § 2(D)(1). These restrictions were subsequently renewed and will remain in effect until January 13, 2021. La. Exec. Dep't, Proclamation No. 209 JBE 2020, § 7 (Dec. 22, 2020).

No. 20-30526
c/w No. 20-30537

replaced by the Governor's phased reopening which permitted churches to operate at greater capacity. *Id.* at 178. By the time of the appeal, churches could operate at up to 50% capacity. *Id.* Consequently, because the stay-at-home order and the challenged ten-person limit "expired," we concluded that the pastor's claims were moot. *Id.* at 179.

*Spell* is instructive but readily distinguishable. Here, the Governor's subsequent orders continue to differentiate between "bars" and "restaurants" in their respective operating capacities and reopening gating criteria. Consequently, even though the restrictions on "bars" may have lessened, the crux of the bar owners' equal protection claim remains unchanged. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) ("The new ordinance may disadvantage them to a lesser degree than the old one, but . . . it disadvantages them in the same fundamental way.").[9]

## IV. DISCUSSION

Satisfied of our jurisdiction to consider the bar owners' appeal, we turn to the merits. First, the bar owners argue that the district courts erred in applying *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and this court's recent decision in *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), as controlling their equal protection challenge to the Governor's public health

---

[9] The bar owners alternatively contend that their challenge to the Bar Closure is not moot because it is capable of repetition yet evading review. In *Spell*, because the Governor's subsequent orders significantly expanded in-person gatherings available to houses of worship, we held that it was "speculative, at best, that the Governor might reimpose the ten-person restriction or a similar one." *Spell*, 962 F.3d at 180. By contrast, each of the Governor's subsequent proclamations has made no similar progression with respect to the differential treatment of bars and restaurants, as illustrated most recently by the state's return to a "modified" Phase 2.

No. 20-30526
c/w No. 20-30537

orders. Second, even under *Jacobson* and *Abbott*, they argue that the Bar Closure Order's differential treatment violates their equal protection rights.

## A. *Jacobson* and *Abbott*

Our court recently articulated that a state's emergency response to public health crises, including pandemics such as COVID-19, is reviewed under the framework originally set forth by the Supreme Court in *Jacobson*. *See Abbott*, 954 F.3d at 786. Both district courts, necessarily adhering to our court's pronouncement that "*Jacobson* remains good law," *id.* at 785, applied the *Jacobson* and *Abbott* framework to the bar owners' challenge here.

*Jacobson* involved a challenge to Massachusetts's 1902 compulsory vaccination law during a smallpox epidemic. *Jacobson*, 197 U.S. at 26. In that case, the plaintiff argued that the law violated his Fourteenth Amendment right "to care for his own body and health." *Id.* The Supreme Court rejected the claim, emphasizing that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. In upholding the state's law, the Court concluded that judicial review is limited to whether "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31.

In *Abbott*, our court explained that "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *Abbott*, 954 F.3d at 786 (emphasis in original). Like *Jacobson*, *Abbott* involved a substantive due process challenge to a state's public health order. Specifically, the *Abbott* plaintiffs challenged the Texas Governor's March 22, 2020 executive order, GA-09, which temporarily postponed "non-essential surgeries and procedures," including abortions, in order to preserve hospital capacity and personal protective equipment in light of the

No. 20-30526
c/w No. 20-30537

COVID-19 pandemic. *Id.* at 777, 780. The district court partially enjoined the order as unconstitutionally imposing an "outright ban" on pre-viability abortions in contravention of Supreme Court precedent. *Id.* at 781. A divided panel of our court granted Texas's petition for a writ of mandamus because the district court "fail[ed] to apply (or even acknowledge) the framework governing emergency exercises of state authority during a public health crisis, established . . . in *Jacobson*." *Id.* at 783.

The panel pronounced that "when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Id.* at 784 (quoting *Jacobson*, 197 U.S. at 31). Consequently, under *Jacobson*, "the district court was empowered to decide only whether GA-09 lacks a 'real or substantial relation' to the public health crisis or whether it is 'beyond all question, a plain, palpable invasion' of the right to abortion." *Id.* at 786 (quoting *Jacobson*, 197 U.S. at 31).

In *Abbott*, the majority concluded that the answer to both was "no." *Id.* As to the first inquiry, the majority found that the order was a "valid emergency response to the COVID-19 pandemic" that was "supported by findings" related to the shortage of medical supplies and hospital capacity. *Id.* at 787. Though a "drastic measure," the majority concluded that it "cannot be maintained on the record before us that [it] bears 'no real or substantial relation' to the state's goal of protecting public health in the face of the COVID-19 pandemic." *Id.* (quoting *Jacobson*, 197 U.S. at 31).

As to the second inquiry, the majority concluded that because GA-09 only "temporar[ily] postpone[d] . . . non-essential medical procedures, including abortion, subject to facially broad exceptions," it did not

14

No. 20-30526
c/w No. 20-30537

"constitute anything like an 'outright ban' on pre-viability abortion." *Id.* at 789. As a result, the majority held that the order "cannot be affirmed to be, *beyond question*, in palpable conflict with the Constitution." *Id.* (quoting *Jacobson*, 197 U.S. at 31). Additionally, the district court "failed to analyze GA-09 under *Casey*'s undue-burden test." *Id.* at 790.

Here, while both parties initially agreed that *Jacobson* and *Abbott* applied to the Bar Closure Order, the bar owners now argue it does not apply to their equal protection claim. Alternatively, they assert that the district courts misapplied *Abbott* and *Jacobson* by granting "elevated deference" to the Governor beyond even modern rational basis jurisprudence. We disagree on both fronts.[10]

To start, the bar owners assert that *Jacobson* and *Abbott*, both of which dealt with fundamental rights under substantive due process, do not apply to their equal protection claim. However, *Abbott* and its application of *Jacobson* govern our review of emergency public health measures, regardless of the rights at stake. *Abbott*, 954 F.3d at 786.

More fundamentally, and contrary to the bar owners' assertion, neither *Jacobson* nor *Abbott* compel a lower level of scrutiny than rational basis review. The bar owners concede that at most rational basis review applies to their equal protection claim. Consequently, we need not consider their broader critique that *Jacobson* or *Abbott* compel a lower standard of

---

[10] The bar owners' attempt to change legal theories on appeal is not well taken. Before the district courts, the bar owners asserted that the Bar Closure Order violated their "fundamental" rights. On appeal, the bar owners now argue that their equal protection claim is based solely on their "nonfundamental" rights, and thus *Jacobson* and *Abbott* do not apply. While we review legal determinations de novo, "[t]he Court will not allow a party to raise an issue for the first time on appeal merely because a party believes that he might prevail if given the opportunity to try a case again on a different theory." *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

No. 20-30526
c/w No. 20-30537

review when heightened scrutiny applies. *Cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (applying strict scrutiny to a church and synagogue's challenge under the Free Exercise Clause of the First Amendment to the New York Governor's COVID-19 order restricting the number of in-person congregants).[11]

   *Abbott* sets forth a two-part inquiry for reviewing the Bar Closure Order here. The first inquiry asks whether the Bar Closure Order lacks a "real or substantial relation" to the COVID-19 crisis in Louisiana. *Abbott*, 954 F.3d at 784 (quoting *Jacobson*, 197 U.S. at 31). It is undisputed that the Bar Closure Order is substantially related to curbing the spread of COVID-19 in Louisiana. The second inquiry asks whether the Bar Closure Order is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* (quoting *Jacobson*, 197 U.S. at 31). In other words: whether the Bar Closure Order is "beyond question, in palpable conflict with the Constitution." *Id.* at 787-88 (emphasis omitted) (quoting *Jacobson*, 197 U.S. at 31).

   This second inquiry requires courts to consider the alleged constitutional harm, and then evaluate that harm in accordance with established principles of constitutional interpretation. *See also Roman Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring) ("*Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue."). For example, in *Abbott*, the court explained that the district court failed to apply *Casey*'s undue-burden test, and therefore failed to balance GA-09's "temporary

---

[11] Likewise, we similarly need not decide in this case the extent to which *Roman Catholic Diocese* casts doubt, if any, on our court's earlier reliance on *Jacobson* in cases where heightened scrutiny does apply. And neither party asks us to do so here.

No. 20-30526
c/w No. 20-30537

burdens on abortion against its benefits in thwarting a public health crisis."
954 F.3d at 778. Here, the bar owners challenge the Bar Closure Order under
the equal protection clause. In evaluating whether the Bar Closure Order's
distinction between AG- and AR-permitted businesses was "beyond all
question, a plain, palpable invasion of rights," both district courts highlighted
the rational justifications for this non-suspect classification; neither court
applied a "sub-rational" level of review. We would reach the same
conclusion applying settled rational basis review.

**B. Equal Protection Claim**

"The Equal Protection Clause of the Fourteenth Amendment
commands that no State shall 'deny to any person within its jurisdiction the
equal protection of the laws,' which is essentially a direction that all persons
similarly situated should be treated alike." *City of Cleburne v. Cleburne Living
Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216
(1982)).

To establish their equal protection claim, the bar owners must show
that "two or more classifications of similarly situated persons were treated
differently" under the Bar Closure Order. *Gallegos–Hernandez v. United
States*, 688 F.3d 190, 195 (5th Cir. 2012) (citing *Stefanoff v. Hays Cty.*, 154
F.3d 523, 525–26 (5th Cir. 1998)). Once that threshold showing is made, the
court determines the appropriate level of scrutiny for our review. "If neither
a suspect class nor a fundamental right is implicated, the classification need
only bear a rational relationship to a legitimate governmental purpose."
*Butts*, 953 F.3d at 358 (citing *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir.
1995)).

Both parties dispute the threshold question of whether the Bar
Closure Order treats similar businesses differently. It clearly does. The Bar
Closure Order and the Governor's subsequent proclamations effectively

17

No. 20-30526
c/w No. 20-30537

classify businesses based on whether they have an AG permit ("bars") or an AR permit ("restaurants"). The appellees deny that the Bar Closure Order treats "bars" differently because even "restaurant bars are prohibited from operating *as a bar*." This misses the point. The incorporated Fire Marshal guidance expressly restricts AG-permitted establishments while allowing businesses with AR or conditional AR permits to reopen.

Because this classification is based on a business permit, and does not differentiate on the basis of a suspect class, rational basis review applies. Such a classification does not "run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993).

The bar owners concede that the Bar Closure Order serves a legitimate government interest. We therefore address the only remaining issue challenged on appeal: whether the differential classification is rationally related to that goal.

The bar owners principally argue that the differential treatment of their businesses is irrational because the Governor denies that he intended to treat any "bar" differently. In other words, they contend that by denying that the classification exists, any rationale for the classification is an invalid pretext.[12] Consequently, they say, the Governor is not entitled to any "theoretical deference" for distinguishing between AG- and AR-permitted businesses.

---

[12] The bar owners do not challenge that the Fire Marshal's guidance is not controlling or that the Governor's incorporation of it violated state law. Nor, as both district courts correctly noted, would such a claim be actionable in federal court. *See Pennhurst*, 465 U.S. at 104.

No. 20-30526
c/w No. 20-30537

To start, we do not interpret the Governor's statements so broadly. The Governor did not disclaim that bars and restaurants are not treated differently; rather, he indicated that it was unnecessary to "list out the type of bars" by "permit type" because he intended all bars to cease "functioning as a bar, whether it's inside a restaurant or if it's a stand-alone business." While the Governor argued that the proclamation itself does not classify "bars" based on permit type, he acknowledged that the incorporated guidance from the Fire Marshal imposed additional restrictions.

In any event, a classification survives rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Moreover, we have held that "[a]s long as there is a conceivable rational basis for the official action, it is immaterial that it was not the or a primary factor in reaching a decision or that it was not actually relied upon by the decisionmakers or that some other nonsuspect irrational factors may have been considered." *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988) (emphasis omitted).

Nor is this a case where we are asked to "accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). As always, any "hypothetical rationale, even post hoc, cannot be fantasy" or be "betrayed by the undisputed facts." *Id.* at 223. Here, the bar owners do not meaningfully refute any of the appellees' theoretical or empirical rationales for the permit-based classification, let alone carry their burden "to negative every conceivable basis which might support it." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 685 (2012) (internal quotation marks and citation omitted).

Unlike AG-permitted bars whose primary purpose is to serve alcohol, AR-permitted businesses must serve more food than alcohol to meet their

No. 20-30526
c/w No. 20-30537

monthly revenue requirements. Even if the Bar Closure Order's classifications are based solely on the premise that venues whose primary purpose and revenue are driven by alcohol sales rather than food sales are more likely to increase the spread of COVID-19, such a rationale, as described by Dr. Billioux and the Governor and credited by both district courts, is sufficiently "plausible" and not "irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). In sum, the Bar Closure Order's differential treatment of bars operating with AG permits is at least rationally related to reducing the spread of COVID-19 in higher-risk environments. *See also League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (Michigan governor's "rational speculation" that the COVID-19 risks associated with gyms based on their environment, the proximity of its patrons, and the primary exercise activities involved was sufficient to justify closing indoor gyms while permitting other indoor facilities to remain open (quoting *Beach Commc'ns*, 508 U.S. at 315)).

Finally, the Bar Closure Order is not unconstitutional because some "bars" may nonetheless continue to operate under AR or conditional AR permits.[13] "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Veritext Corp. v. Bonin*, 901 F.3d 287, 291 (5th Cir. 2018) (alteration omitted) (quoting *Heller*, 509 U.S. at 319). Imperfect classifications that are underinclusive or overinclusive pass constitutional muster. *See, e.g.*, *Vance v. Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is

---

[13] Presumably, any business that does so must comply with both the legislature's and ATC's permitting requirements in addition to the applicable reopening requirements.

No. 20-30526
c/w No. 20-30537

nevertheless the rule that in a case like this perfection is by no means required." (internal quotation marks and citation omitted)).

\*      \*      \*

We are sympathetic to the bar owners, their employees, and other businesses who are hurting financially and face great adversity during this time. Judges Feldman and Summerhays, however, expedited evidentiary hearings, and based on the testimony credited at those hearings refused to second-guess the Governor's determination regarding the health and safety of the state. Judges "are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area." *Roman Catholic Diocese*, 141 S. Ct. at 68; *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Mem.) (Roberts, C.J., concurring) ("The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'").

Appellees' motion to dismiss the appeal as moot is DENIED. The district courts' orders denying injunctive relief are AFFIRMED.

No. 20-30526
c/w No. 20-30537

DON R. WILLETT, *Circuit Judge*, concurring:

As the majority opinion ably explains, we are not the first Fifth Circuit panel to weigh the constitutionality of a state's response to COVID-19. That task fell to *In re Abbott* in April 2020 during the early stages of the pandemic.[1] Reviewing Texas's order postponing non-essential surgeries, *In re Abbott* discerned a governing rule from a 1905 Supreme Court case, *Jacobson v. Massachusetts*: "[W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"[2]

*Jacobson* was decided 116 years ago. And I do not believe it supplies the standard by which courts in 2021 must assess emergency public health measures.[3] *Jacobson* predates modern constitutional analysis, particularly the judge-invented tiers of scrutiny that distinguish between strongly and weakly protected rights (and between protected and unprotected classes). This elaborate three-tiered regime of judicial interest-balancing, a twentieth-

---

[1] *In re Abbott*, 954 F.3d 772 (5th Cir. 2020).

[2] *Id.* at 784 (quoting *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 31 (1905)).

[3] I am not the first to express doubts about *Jacobson*, generally, or *In re Abbott*'s application of it, specifically. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (mem.) (Alito, J., dissenting from the denial of application for injunctive relief) ("And in any event, it is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID–19 pandemic."); *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 943 n.2 (9th Cir. 2020) (Collins, J., dissenting) ("For the reasons stated, I am unable to agree with the Fifth Circuit's conclusion that *Jacobson* instructs that all constitutional rights may be reasonably restricted to combat a public health emergency." (internal quotation marks omitted)); *see also Planned Parenthood of Greater Tex. v. Kauffman*, ___ F.3d ___, 2020 WL 6867212, at *29 n.1 (Nov. 23, 2020) (en banc) (Ho, J., concurring).

No. 20-30526
c/w No. 20-30537

century innovation rather than something enshrined in the Constitution, pervades contemporary constitutional decisionmaking.[4] And *In re Abbott*, in harkening back to *Jacobson* for the "governing framework"[5]—indeed, declaring that "Jacobson governs a state's emergency restriction of *any* individual right"[6]—seems to whoosh past this formalist post-*Jacobson* architecture that dictates different rules for different rights.

That said, it's unclear what, if anything, *Jacobson* added to the analysis in *In re Abbott*, given that, under *Jacobson*'s second inquiry, the panel ultimately applied the current constitutional test (deferential rational-basis review) to the challenged government action.[7] But applying the modern test at *Jacobson* step two (whether measures are "beyond all question, in palpable conflict with the Constitution") renders superfluous *Jacobson* step one (whether measures "have at least some 'real or substantial relation' to the public health crisis").[8] That's because today's constitutional tests consider the government's interest in restricting rights, such as protecting public health. So as applied in *In re Abbott*, *Jacobson*'s "governing framework" is just a roundabout way of conducting a conventional constitutional analysis. In my view, *In re Abbott* misdescribed *Jacobson* as a stand-alone test, rather than as merely a recognition of a state's authority to enact temporary measures during emergent public health crises.

---

[4] *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting) ("Though the tiers of scrutiny have become a ubiquitous feature of constitutional law, they are of recent vintage.").

[5] *In re Abbott*, 954 F.3d at 795.

[6] *Id.* at 778 n.1 (emphasis in original).

[7] *Id.* at 787–88 (applying the undue-burden standard to a postponement of abortion procedures).

[8] *Id.* at 784 (quoting *Jacobson*, 197 U.S. at 31).

No. 20-30526
c/w No. 20-30537

Summing up: Stare decisis requires us to apply rational-basis review (the most obeisant form of judicial scrutiny) to economic legislation like the Bar Closure Order, but we should eschew any suggestion that *Jacobson* requires us to do so.